May it please the Court, Kathryn Tassinari representing Samuel Hunt, the claimant in this case. There is no dispute that the claimant has made a prima facie case for disability at steps 1 and 4 of the sequential analysis, and the parties also agree that Mr. Hunt has a psychotic disorder, a cognitive disorder, depression, and has advanced degenerative disc disease of the lumbar spine. The lowest IQ score between two psychologists' test results was a 71, just one point above the listing level of impairment for what used to be called processing speed at the third percentile. The primary question in the case is whether the opinion of Dr. Troon, one of the examining psychologists, should be credited. Dr. Troon found that plaintiff's low intelligence causes significant impairment in verbal comprehension, attention, concentration, and in Mr. Hunt's ability to solve day-to-day problems. The ALJ did not credit, well, the ALJ credited Dr. Troon's diagnoses, which were all considered to be severe impairments at step 2, but the ALJ rejected the psychologist's findings of marked mental limitations on the Mental Residual Functional Capacity form. This was a form that the VE found that the limitations identified there were disabling. So, one of the first reasons is, and this is a theme for this as well as how the ALJ dealt with the work assessment at Goodwill, the ALJ said that the claimant was not credible and that his representations to Dr. Troon had, he didn't use the word tainted, but essentially he's saying had skewed or tainted the doctor's opinion. So, one of the first things was, he, the ALJ stated that the claimant had a history of semi-skilled work, which was inconsistent with the findings that the doctor reached. And the first point on that, of course, is that the claimant's condition has worsened. While borderline intelligence was likely a lifelong affliction, he, the claimant has testified and the evidence, there's no evidence that he had other, these other conditions prior to the relevant period. What other conditions? Pardon me? What other conditions? I'm sorry. Psychotic disorder, cognitive disorder, and depression. Now, Mr. Hondo discussed depression because that's the thing that he can relate to, and he said that over the last, it sounded like seven, eight years before the hearing, he had periods of worsening, but he also had periods of remission where he could work. So, but one thing I want to point out is, if you look at the earnings record, the fact that the claimant did do two jobs that were semi-skilled isn't inconsistent at all with Dr. Troon's opinion. In 13 of the last 20 years, he made less than $5,000. In 18 of the last 20 years, he made less than $10,000. Now, one of the things that the ALJ was concerned about is that Mr. Hunt reported that he hadn't had a real, he called it a paycheck since 2001 and had worked only odd jobs since then, while the ALJ noted that he had actually earned $6,000 in 2006. But if you look at the earnings record, you can see that he actually held six different jobs in 2006, some of them ranging from where he received as little as $250, you know, $350, and then up with some in a couple thousand dollar payments. It's pretty obvious that what he meant was a permanent job. When he said I didn't have a permanent job, I had a paycheck. I think that's what he meant. See, he was obviously making a distinction between some job and some other job, but it was just his way of saying it wasn't a regular job. That's my understanding, Your Honor. And also, if you look at the earnings record, it's striking how many jobs he has held. That many years, he had three jobs in 2007, three in 2005, five jobs in 2000, and so forth. But one of the last things that the ALJ was concerned about, in terms of Dr. Trinh's opinion, was the lack of treatment, and there is no doubt that the claimant, at least in this record, has not had much psychological treatment. And he had a little bit at one point, and there were, you know, maybe like four or five times that he met with a psychologist. And there were findings that he was frequently highly agitated and angry and so forth, and then he just stopped. So it looks like he went for maybe from August to December of 2009. And his explanation, elsewhere in the record, he explains that he doesn't have the money, and there's certainly no doubt in this record that he's an impoverished claimant. He's claiming SSI benefits and has received an IFP, and he has said that he cannot afford treatment for his back condition. But he didn't say that about his mental treatment. He said that he couldn't get a ride to this provider. He lives in Junction City and needed a ride to Eugene, and he couldn't get one. And the ALJ found that that was, well, actually the ALJ just said there was lack of treatment. I don't know if, I can't remember if the ALJ actually addressed transportation. But at any rate, that is the claimant's reasoning. And in my opinion, excuse me, my opinion doesn't matter. But I think the record shows that Mr. Hunt is severely impaired in his ability to make common sense reasoning and solve day-to-day problems. And if there was a solution within his financial means to obtain transportation to Eugene, I think the record shows that he lacks the capability to do it, or at least he did in this case. So our argument is that Dr. Troon should be credited. And if he is credited, then the claimant should be found to be disabled. It seems like the real problem is that even if he's credited, that he did, in one way or another, do a fair amount of work for a very long time. And so without some change in his, either some change in his mental condition or a change in his physical condition, which is largely a back issue, is that right? That's right. Is there any showing of a change in his back issue? Well, we don't have a lot of records on this. But we do have, he said that he was in a car accident in around 2001 and hadn't worked a whole lot between 2000 and 2001. And then we have a record showing that he had advanced degenerative disc disease. We also have a record that shows that according to, there's a discussion of all of the past work he's done at 362 in the excerpts of record. And that talks about all the different points. And he's done a lot of very heavy work. He worked as a dock hand. He looked like a lot of the work was kind of seasonal work. He really did, he was a hot carrier. He was a general laborer. He really did a lot of heavy work. And nobody disputes at this point that he can no longer do that type of work. Which really brings me to the Goodwill assessment, which, this was an assessment done at Goodwill, it looks like it was through Vocational Rehabilitation, where Mr. Hunt worked for 20 days. And he was working part-time, four-hour shifts. And after that 20 days was over, there are two things they came up with. One is they rated his ability in a number of key areas in terms of whether he was competitive or not. And they found he was competitive in one area, which was interpersonal relations. They said he's a very nice man, he's very kind and considerate, was always eager to help. However, they also found in other areas that he was only approaching competitive work level. And in some levels was, needed improvement and was absolutely not competitive in his ability, his physical ability. Now, when this report went to the Vocational Rehabilitation people, they read it and they said our assessment is that he's not going to be able to work competitively. Because with these limitations, he's not in his learning disability in fifth grade education, he's not going to be able to learn how to do a job where he's less sedentary. And one of the concerns the ALJ had was that nobody has said he has a learning disability. And that is certainly true. However, the reason he doesn't have a learning disability is his intelligence is so low that there is not the deviation between the subtests and what you would expect from the IQ level. He does have a very low IQ, no doubt about that. And even though his tests, his reports about his education level are quite over the map, the testing is consistent. Nobody disagrees that his tests, that he tests at the fourth and fifth grade level academically. So even if he had perhaps some more education than that level, it hasn't amounted to anything. And finally, the ALJ said that this work assessment showing that Clayman couldn't work was inconsistent with Dr. Perry's finding that he could work four hours a day. And as I argued in my brief, Dr. Perry qualified his opinion quite a bit saying that if he had to do any kind of significant work activity, he'd be limited to only two hours a day. And at any rate, Dr. Perry did not have the X-ray results that came out a month later showing advanced degenerative disc disease. I'm going to reserve the rest of my time. Thank you. Good morning and may it please the court, Jeff Staples for the commissioner who asks that you affirm the district court's judgment because the ALJ's decision is supported by substantial evidence and free of legal error. The only issue in this case is the ALJ's weighing of the medical evidence. So I'll begin with Dr. Troon's opinion. The ALJ rejected it for three reasons, one of which was that it was wildly inconsistent with Mr. Hunt's work history. As Judge Berzon pointed out, there's really no evidence that anything particularly changed. Fairly wildly inconsistent, it seems to me that he was doing fairly heavy work which didn't require a lot of mental acuity. And if one thought he could no longer do that work, which seems to be what the ALJ thought, then in other words, it wouldn't be that his mental situation had changed, but that the impact of his mental situation on his ability to work could have changed, given what else he was able to do now. Well, respectfully, Your Honor, I would disagree with the characterization that this, that his past work did not require any mental acuity. It was semi-skilled work, as the vocational expert pointed out, and that does require more mental acuity than Dr. Troon allowed Mr. Hunt. Dr. Troon indicated I'm not understanding. Is the doctor, was the ALJ disagree with any of the objective results that Dr. Troon obtained? No, Your Honor. By you and all the tests you did and so on? No, the ALJ disagreed with his assessment of at least a dozen marked cognitive limitations stemming from his impairments. And that level of limitation is not consistent with his ability from a mental perspective, although I do agree with you that, and the ALJ did as well, that he does no longer retain the physical capacity to do that heavy work. He nevertheless showed a mental capacity for more than Dr. Troon ascribed to him, as evidenced by his ability to perform semi-skilled work, which is not highly skilled work, but it's more than just unskilled work. Well, what did he do? He was a truck driver. He said he was overwhelmed by it. He worked in a carnival. He was a dry dock worker, a truck driver, a meat grater, and a deckhand. And as described in the Dictionary of Occupational Titles, these are not just unskilled jobs. These are semi-skilled jobs. I mean, all that formality is really not helpful to me very much. All right. I understand that that's the way the publicist world works, but it's very peculiar. I agree that there are a lot of peculiarities in the world of Social Security disability adjudication. Assuming that reason. And what did the ALJ of all to conclude that he could do now? Boy, that's, I do not have that off the top of my head. I can go look. Fairly important. I assume they're unskilled jobs, Your Honor. Do you want me to look for a second? Anyway, the ALJ also said that Dr. Chern's opinion was not consistent with the level of mental health treatment that Mr. Hunt received. He went to only four months of counseling and testified that he... So the ALJ obviously was really annoyed with him for smoking cigarettes and said if he didn't smoke the cigarettes, maybe he could have gotten there. I didn't really understand the connection there, but... Well... So part of his testimony was that he couldn't afford other treatment for his physical impairments. And he didn't smoke a half a pound of cigarettes, a half a pack of cigarettes a day, he couldn't afford just medical care. Does that make any sense at all? Well, I think the idea that I can't afford my treatment is not necessarily consistent with the idea that I can't afford cigarettes. If his impairments were as severe as he claimed, it might be reasonable for the ALJ to infer that he would have diverted funds to that treatment. But why does a cigarette attest to it? Or the marijuana, in terms of money? I mean, the amount of money you're talking about, for a half a pack of cigarettes a day, would have paid for any significant amount of medical treatment. Well, whether that was a valid credibility consideration or not... Really, I mean, obviously he had a problem with this guy, which gives me pause about the whole situation. Well, the ALJ also gave numerous other reasons for discounting Mr. Hunt's credibility, none of which are challenged. Which weren't so sensible either. I mean, if you have a man with severe mental problems and you're complaining about him not remembering things, I mean, that's his problem. He doesn't remember things. So the fact that he said different things at different times isn't a very good way to judge his credibility. Well, the question when you're talking about credibility, which, let me point out again, is not challenged here. But when you're talking about credibility, it's not an assessment of whether a person is intentionally lying. So it may very well be that he just can't remember anything. No, but he used the fact, as I recall, and you're saying this isn't being questioned here, and I guess I need to find out whether that's true, but he used the fact that he had given different information, for example, about, well, let's think about the paycheck, to discount his testimony about his ability, his physical abilities. In other words, he carried it over, right? He didn't just use it to discount, to not believe the story about how much money he had earned, but he used it to discount his self-reporting of his capabilities, right? Is that correct? Yes. Okay, so he didn't just use it for the purpose of, he did use it for the purpose of saying essentially he's a liar. I don't think that's what a credibility assessment means. Well, it doesn't necessarily mean it, but in this instance it did. I think that just the ALJ said that he could not credibly testify about his limitations. That doesn't mean that he's lying about anything in particular. It just means that for whatever the reason, this person could not give consistent testimony, and so we can't take what he's saying at face value. And so when that's the case, as is not contested here, you have to look at the medical evidence. Is that a difference between testimony about what happened 20 years ago when you graduated and when you went to school and testimony about what you're doing right now? Well, this court has held that those kinds of inconsistencies do serve to undermine a claimant's credibility. On the theory that you're not a truth teller, but that's a different story. You're now saying, well, it wasn't necessarily a proof that he wasn't a true truth teller. I think the fact that you give inconsistent statements about anything, be it your education level, be it your drug history, which was also a factor here, Mr. Hunt simply was not giving consistent statements on a number of issues. And so when that's the case, this court has permitted ALJs to say, okay, if you can't credibly testify about a number of subjects, then it's reasonable for me as the ALJ to assume that you're also not testifying credibly about the extent of your limitations. Those are, as this court has held, clear and convincing reasons and at the risk of beating a dead horse, that is not challenged here. So when, for instance, the ALJ looked at Dr. Troon's assessment, he noted that it appeared to be based at least in some part on Mr. Hunt's report that he had not taken a paycheck. And since 2001, and as Your Honor pointed out, it may be looking at the record as a whole, it may be that what Mr. Hunt meant by that was that he hadn't held a steady job since 2001. Well, Dr. Troon didn't have access to the entire record as we have it here, and so he was stuck with what Mr. Hunt told him. And so since Mr. Hunt said something that is patently not true, as demonstrated by the record, I haven't taken a paycheck since 2001, Dr. Troon was at a disadvantage in terms of coming up with a reliable analysis of his functional limitations, and the ALJ looked at this record and pointed out that shortcoming in Dr. Troon's report. Is there any indication that Dr. Troon relied on that information rather than his objective tests? Well, the mere fact of objective tests don't necessarily describe the exact limitations. The numerous market limitations in many areas of functioning that Dr. Troon described, there's no direct link between those. The fact that he did or didn't get a paycheck since 2001, have had any influence on that? Because Dr. Troon was under the impression that these long-standing impairments have prevented Mr. Hunt from doing any work for a very long period of time, and that simply wasn't the case. So the ALJ was reasonable in terms of looking at Mr. Hunt's work history of semi-skilled work and his ability to earn some money from that, which does demand some more mental acuity than Dr. Troon ascribed to Mr. Hunt. That, coupled with the fact that he underwent only four months of mental health treatment, and didn't get any mental health treatment even when he had a driver's license, which he testified was the reason he could no longer go to mental health treatment, those were reasonable bases on which to discount Dr. Troon's opinion. Similarly, the Goodwill assessment was explicitly based on three factual assumptions, none of which were true. They were not, hey, I'm sorry, sorry to cut you off, but they were not accurate, maybe in a very technical sense, but weren't they, I mean, from a material standpoint, they were consistent with the record, no? I guess I found the ALJ's reasons for rejecting the Goodwill industry's assessment particularly flimsy. So I'd love, if you're going to defend that, I'd love to hear why you think it was well supported. Well, Your Honor, the Goodwill assessment was based on, predicated on the idea that Mr. Hunt had a learning disability. Well, that is really technical. I mean, what they presumably meant was he couldn't learn very well, which is true. Why even, whether he had a learning disability in the technical sense, i.e. as opposed to his overall mental capacity, or whether he just had a bad mental capacity wasn't their problem. The fact that he, for whatever reason, couldn't read very much. Well, the Goodwill assessment... No, it's because he had dyslexia, because he just wasn't very bright, just kind of immaterial. Well, the assessor didn't say, as a broad matter, he appears to have a low intellectual functioning. The assessor specifically said, he has a learning disability, and on this basis, we find him unable to work. And a layperson who is interested in what the person can actually do, as opposed to what the reason is, knows what the term learning disability means. In a lay term, a learning disability means, you're disabled from learning, you can't learn. Well, that's one way of looking at this assessment. Another is that they actually thought he had a learning disability. What differences did that make? What they knew about him was functional, i.e. he didn't function well mentally. But they specifically gave these reasons. He had a learning disability, he had a 5th grade education, and he had disabling... As a functional matter, he was functioning at a 5th grade level, so they were completely accurate, right? Well, it wasn't completely accurate, because he had more than a 5th grade education. He had been to school for more than that, he may not have, we don't know. But the net result was, he was functioning at a 5th grade level. Everybody agrees with that, is that right? That he was functionally at a 5th grade level? Functionally. I think, as a general matter, yes, I'll agree. Completely on target. However many years he worked at the school for. Well, respectfully, Your Honor, that's not what the assessment said. The assessment didn't say, functionally, he has a learning disability, and functionally, he has a 5th grade education. They said, he has a learning disability, and a 5th grade education, and for those reasons, we find him unable to work. Those two things are not true. They watched him, and he couldn't work. That's most important. But they used these as bases for their assessment. They didn't just say, we watched him, and he can't work. They said, he has a learning disability, he has a 5th grade education, and he has physical limitations that prevent any competitive work. And those three things are all not worn out by the record. And so, while it could be reasonable to interpret this assessment as saying, well, from a general standpoint, these things are functionally equivalent to true, it was also reasonable for the AALJ to look at these things and say, as a practical matter, the bases on which the Goodwill made their assessment are not true. And so, for that reason, it was acceptable for the AALJ to say, you know what, I can't give this assessment great weight, because the stated bases for the opinion are flatly contradicted by the record. But weren't the Goodwill Industries folks, however they, whatever terminology they used, weren't they giving their opinion based on their evaluation of him in the workplace for, I can't remember how long it was, whatever it was, two, three, four weeks? Yes, your honor. Okay, three weeks. So, I guess I'm not, I just am not, I'm not understanding your, the confidence with which you assert that, you know, they base this on misinformation. I assume they observed him in a workplace setting and formed some opinions about his intellectual, his level of functioning, and then they translated that, maybe not, you know, using the right terms of art, into the conclusions that they gave. And they just strike me as being, yeah, that's basically true. What Kate concluded is basically true in light of the rest of the record we have. I see my time is up. May I just respond to this question? Thank you. The way, the reason for, I hope it's not overconfidence, but the reason for my confidence is that the Goodwill explicitly stated that these were the bases for their assessment. They did not say, we've observed him and here's what we conclude. They said, we've observed him and as a basis for our assessment, we rely on the fact that he has a learning disability, a fifth grade education, and physical impairments, which prevent any competitive employment. And because they explicitly, physical impairments, he said, we would recommend that he secure skills in a field that did not require physical strength and stamina, and that is consistent with the ALJ, right? Yes, the ALJ found he was limited to a range of light work. And so that's not inconsistent with what the ALJ said? Well, But he can't do it because it would be very difficult due to his learning disability and his education. If we change the language and say, if we said to this person, oh, well, he doesn't have a learning disability and he doesn't have a fifth grade education, he just operates at a fifth grade level and he has a 70 IQ, would you say anything different? If you change the language of the assessment, then we'd be having a different discussion. But the fact is, the language is what it is and because they said, and you quoted it right there, because of his learning disability and because of his fifth grade education, and those things just aren't actual facts. They're basing their assessment on dyslexia, right? Because he doesn't really have a reading problem. Well, the question is not what is the functional equivalent of these impairments? I think the question is what did they say they based their assessment on? And although, as I pointed out, it might be reasonable to read this assessment in a light more favorable to Mr. Hunt's disability claim, it was certainly reasonable for the ALJ to read the assessment as written and compare it with the facts in the record and see that they simply don't line up. And so, because that was a reasonable assessment, we would ask this court to affirm. Thank you. Just a short piece on that. If you throw out the voc rehab language and the goodwill language about the learning disability and the fifth grade education and you just look at their evaluation report, which is at 366-367 of the excerpts of record, at hearing, plaintiff's counsel asked the vocational expert to look at just these two pages exhibit 18E, 4 and 5. That's what he looked at. It doesn't have any of the language about disability, learning disorder, and so forth. And the V.E. testified that the limitations identified in the goodwill situational assessment at these pages would preclude competitive work. So... What about the credibility findings? Is it correct that you're not challenging it? I'm not, Your Honor. I think that in some places I could see that it might have been how the question was asked and so forth. He certainly had a chaotic childhood, so I believe from what he said he was pulled in and out of his adoptive parents' homes a couple times, so... Would that be relevant to anything? I mean, it would appear to be relevant to the fact that his assessment of his current daily situation was not complete. I believe the ALJ was concerned that Dr. Troon was misled, and I think we've answered that. Dr. Troon actually very specifically twice expressed concern about... He expressed concern that the claimant was actually able to get accurately or give him a full story of what his psychological problems were, and Dr. Troon also stated that he wasn't confident that Mr. Hunt could benefit from therapy, although Mr. Hunt did say he found it somewhat helpful. A number of times Dr. Troon expressed... He seemed to feel that the claimant wasn't really fully capable of giving him the whole story, so I don't believe he was misled. Thank you very much. Thank you. Those are our arguments. Case of Hunt v. Coleman is submitted and we are in recess. Thank you.
judges: Berzon, Watford, Sammartino